# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO.** |
| v. | : | **DATE FILED** |
| REECE A. LINE | : | **VIOLATIONS:** |
| | | **18 U.S.C. §§ 1341, 3559(g) (mail fraud** |
| | : | **– 22 counts)** |
| | | **18 U.S.C. §§ 1343, 3559(g) (wire fraud –** |
| | : | **8 counts)** |
| | | **26 U.S.C. § 7201 (tax evasion –** |
| | : | **3 counts)** |
| | | **18 U.S.C. § 2 (aiding and abetting)** |
| | : | **Notice of Forfeiture** |

## I N F O R M A T I O N

## COUNTS ONE THROUGH TWENTY-TWO

## THE UNITED STATES ATTORNEY CHARGES THAT:

At all times relevant to this information:

1.     The Neat Company ("Neat") was a corporation with its headquarters in Philadelphia, Pennsylvania, engaged in the business of selling document scanners and providing small business software solutions and cloud-based data and document retention. Neat sold a scanner referred to as the NeatConnect Cloud Scanner with a retail price of approximately $499. NeatConnect Cloud Scanners purchased from authorized retailers were covered by a one-year warranty against defects in materials, workmanship and failure to conform within the manufacturer's published specifications.

2.　　　NeatConnect Cloud Scanner owners wishing to initiate a warranty claim contacted the company via phone or through Neat's customer support webpage. If Neat's customer service was not able to solve the problem through troubleshooting, a warranty replacement was initiated. The customer was required to provide their name, email address, serial number, proof of purchase and shipping address. Upon receipt of what it believed to be a valid warranty claim, Neat shipped replacement scanners to customers. Neat required that the defective scanner had to be returned by the customer, and provided return shipping instructions to the customer along with the replacement scanner.

3.　　　All NeatConnect Cloud Scanner warranty replacement requests were processed by Neat's headquarters in Philadelphia, Pennsylvania. In 2014, all NeatConnect Cloud Scanner warranty replacement products were shipped from Philadelphia, Pennsylvania via commercial interstate carrier United Parcel Service ("UPS"). Beginning in 2015, all NeatConnect Cloud Scanner warranty replacement products were shipped from Neat's warehouse located in La Vergne, Tennessee, via commercial interstate carrier UPS upon receipt by the warehouse of an e-mail wire communication from Neat's headquarters in Philadelphia, Pennsylvania, directing such shipment.

4.　　　iRobot Corporation ("iRobot") was a company with its headquarters in Bedford, Massachusetts, engaged in the business of designing and selling consumer robots to perform tasks inside and outside the home. iRobot sold a consumer robotic vacuum referred to as the Roomba 980 with a retail price of approximately $899. Roomba 980 Robotic Vacuums purchased from authorized retailers were covered by a warranty guaranteeing the product would be in good working order for a period of one year from the date of purchase.

2

5.      Roomba 980 Robotic Vacuum owners wishing to initiate a warranty claim must first have registered their Roomba's serial number with an account on iRobot's support website. When the owner of a Roomba 980 Robotic Vacuum contacted iRobot's customer support via phone or chat to report a problem, the iRobot customer service representative verified the name, email address and contact information that was given when the serial number was originally registered, and then attempted to troubleshoot the customer's problem. If iRobot's customer service was not able to solve the problem through troubleshooting, a warranty replacement was initiated. iRobot then shipped a replacement product to its customer, along with a return label so the defective product could be returned to iRobot free of charge.

6.      iRobot shipped Roomba 980 Robotic Vacuum warranty replacement products from iRobot's warehouse located in Lancaster, Pennsylvania, via commercial interstate carrier.

7.      APC by Schneider Electric (formerly known as American Power Conversion Corporation) ("APC"), was a subsidiary of Schneider Electric, a multinational corporation based in Rueil-Malmaison, France. Schneider Electric developed energy management and automation solutions for residential, commercial, data center, infrastructure and industrial applications. APC itself was headquartered in West Kingston, Rhode Island.

8.      APC was a manufacturer of uninterruptible power supply products, electronics peripherals, and data center products. APC was well known for its line of uninterruptable power supply products referred to as "Smart-UPS," which were available in a variety of form factors and classes. Two of the Smart-UPS models manufactured by APC were the models SMT3000RMTU and SMT1500, which had retail prices of approximately $1,849.99 and $699.99, respectively.

9.      APC manufactured, sold and supported its Smart-UPS products on a global scale. APC supported its Smart-UPS products with comprehensive warranties ranging from one to three years. Both the model SMT3000RMTU and SMT1500 were supported with three-year warranties that provided replacement for defective products.

10.      When an APC customer needed technical assistance on a Smart-UPS product that was under warranty, the customer could notify APC via electronic chat through the company's website (www.apc.com). APC employed Technical Support Agents ("TSA") who responded to requests for technical assistance via chat. If the TSA was not able to solve a customer's problem through troubleshooting, the TSA would generate a Return Material Authorization ("RMA") number, initiating the process to deliver a replacement product to the customer.

11.      Most APC warranty replacement products were shipped from an APC warehouse located in Middletown, Pennsylvania, via commercial interstate carrier.

12.      Amazon.com, Inc. ("Amazon") was a corporation with its headquarters in Seattle, Washington, engaged in the business of electronic commerce. Amazon sold merchandise and provided a platform for third parties to sell merchandise via the Amazon Marketplace through the Amazon.com website. Purchases initiated from the Amazon.com website were made via the internet, and both Amazon and those third parties selling through the Amazon Marketplace shipped the purchased goods via the United States Postal Service ("USPS") and private and commercial interstate carriers, including, Federal Express ("FedEx") and UPS to the addresses provided by the customers.

13.      Persons who wished to purchase goods sold by Amazon, or third parties hosted by Amazon, registered with Amazon and created an Amazon.com account. The creation

of an Amazon.com account required a name, an e-mail address, a delivery address, and a method of electronic payment, such as a credit card, debit card, or gift card.

14.    When an item purchased via the Amazon.com website failed to arrive at the address provided by the customer, or arrived in a defective or damaged condition, Amazon typically provided the customer with a refund or replacement item. Amazon referred to these refunds and replacements as "concessions."

15.    An Amazon.com customer initiating a refund or replacement did so by contacting Amazon.com customer service via phone or online chat. The customer was then required to provide their order number, Amazon.com account information such as email address, name and shipping address, as well as a description of the problem with their order. If a customer claimed that an item did not arrive as reported by the order's tracking information, the Amazon.com customer service representative typically offered a refund or offered to ship a replacement item.

16.    Cisco was a corporation based in San Jose, California specializing in providing internet networking hardware and software for business, government, and individuals. Cisco's core development areas were in switching and routing, which enabled Cisco customers to communicate through the use of the World Wide Web.

17.    Cisco manufactured, sold, and supported computer networking equipment on a global scale. Cisco supported its products through two means: (a) a Limited Lifetime Hardware Warranty Program and Enhanced Limited Lifetime Warranty Program offered with Cisco hardware and software (hereinafter a "Cisco Warranty"); and (b) a more comprehensive suite of support offered to customers for a fee (called and referred to by Cisco as "SMARTnet" Service).

18.     The Cisco Warranty and SMARTnet Service were not transferrable. That means that any purchase of used or secondary-market Cisco equipment was not covered by the Cisco Warranty or SMARTnet Service even if it was purchased through a Cisco channel partner or distributor. Before used or secondary-market equipment could be placed under a new support contract, the requester was required to show proof of a valid software license or pay relicensing fees and must have had the equipment inspected to confirm that it was in proper working order and had been maintained appropriately.

19.     When a customer needed technical assistance on a device that was under Warranty or SMARTnet service, the customer could open a Cisco service request ("SR") and report its problem to Cisco in one of the following ways: by telephone, email, or through Cisco's website (www.cisco.com).

20.     Cisco maintained Technical Assistance Centers ("TAC") worldwide to process these requests for service. All requests for service generated an SR number, which was used to track the reported problem until it was resolved. Upon creation of the SR, information about the customer was captured as well as the specific product complaint. Once initiated, the SR was sent to a Cisco TAC engineer for problem diagnosis and resolution. The TAC engineer would determine if the customer was entitled to a replacement product under the terms of Cisco's Limited Warranty Program or SMARTnet service.

21.     If the customer was entitled to a replacement product, TAC would generate a Return Material Authorization ("RMA") reference number, initiating the process to deliver a replacement product to the customer. Under Cisco's Warranty and SMARTnet Service Programs, customers could be entitled to advance replacement, meaning that Cisco or one of its service centers would ship a replacement product to the customer before the customer sent back

the faulty part, with the understanding that the faulty part would subsequently be returned to

Cisco upon receipt by the customer of the replacement part. Cisco notified customers who

received advance replacement that they must return the defective product.

22.     Most Cisco warranty replacement products were shipped from Cisco's

warehouse located in Roanoke, Texas, via commercial interstate carrier.

23.     Bitcoin was a type of virtual currency, circulated over the Internet as a

form of value. Bitcoin were not issued by any government, bank, or company, but rather were

generated and controlled through computer software operating via a decentralized, peer-to-peer

network. Bitcoin were sent to and received from Bitcoin "addresses." A Bitcoin address was

somewhat analogous to a bank account number and was represented as a 26-to-35-character-long

case-sensitive string of letters and numbers. Each Bitcoin address was controlled through the use

of a unique corresponding private key, a cryptographic equivalent of a password or pin needed to

access the address. Only the holder of an address's private key could authorize any transfers of

bitcoin from that address to other Bitcoin addresses.

24.     To transfer bitcoin to another address, the payor transmitted a transaction

announcement, cryptographically signed with the payor's private key, across the peer-to-peer

Bitcoin network. The Bitcoin address of the receiving party and the sender's private key were the

only pieces of information needed to complete the transaction. These two keys by themselves

rarely reflected any identifying information. As a result, little-to-no personally identifiable

information about the payor or payee was transmitted in a Bitcoin transaction itself. Once the

payor's transaction announcement was verified, the transaction was added to the blockchain, a

decentralized public ledger that recorded all Bitcoin transactions. The blockchain logged every

Bitcoin address that ever received a bitcoin and maintained records of every transaction for each Bitcoin address.

25.     To acquire Bitcoin, a typical user would purchase them from a Bitcoin "exchanger." Bitcoin exchangers generally accepted payments of fiat currency (currency that derived its value from government regulation or law), or other convertible virtual currencies. When a user wished to purchase Bitcoin from an exchanger, the user would typically send payment in the form of fiat currency, often via bank wire or ACH, or other convertible virtual currency to an exchanger, for the corresponding quantity of Bitcoin, based on a fluctuating exchange rate. The exchanger, usually for a commission, would then either sell the user Bitcoin from the exchange's reserves or would attempt to broker the purchase with another user who was trying to sell Bitcoin. The purchased Bitcoin were then transferred to the purchaser's Bitcoin address, allowing the user to conduct transactions with other Bitcoin users via the Internet.

26.     Virtual currencies, including Bitcoin, have known legitimate uses. However, given the ease with which Bitcoin can be used to move funds with high levels of anonymity, Bitcoin could be used to facilitate illicit transactions and to launder criminal proceeds.

27.     PayPal Holdings Inc. ("PayPal") was a corporation with its headquarters in San Jose, California, engaged in the business of operating a worldwide online payment system that supports online money transfers and serves as an electronic alternative to traditional paper methods of making payment for goods and services. PayPal operated as a payment processor for online vendors and auction sites. Individuals and businesses established PayPal accounts that they could use to make and receive money transfers, including for the purchase or sale of

merchandise or services. These PayPal accounts were typically linked to bank accounts at financial institutions from which and into which the PayPal customers could transfer funds.

28.     eBay Inc. ("eBay") was a corporation with its headquarters in San Jose, California, engaged in the business of electronic commerce. eBay facilitated consumer-to-consumer and business-to-consumer sales through its website. Individuals and businesses sold products through eBay by posting the items to be sold on eBay's website and offering the items for sale in either an auction format, a fixed price format, a best offer format, or a combination of these formats. Sellers could also create eBay "stores" on the eBay website that would allow the sellers to advertise all of the items they were selling through the eBay website. Purchasers typically paid for the items they bought on eBay using PayPal.

## THE SCHEME

29.     Beginning in or about November 2014 and continuing until in or about June 2017, within the Eastern District of Pennsylvania and elsewhere, defendant

### REECE A. LINE

together and with co-schemers known and unknown to the United States Attorney, devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

## MANNER AND MEANS

It was part of the scheme that:

30.     Defendant REECE A. LINE, Gerald Alan Goss, charged separately, and other co-schemers known to the United States Attorney, registered false domain names.

31.     Defendant REECE A. LINE, and other co-schemers known to the United States Attorney, took steps to prevent the effective identification of themselves as the persons

who registered the false domain names, including paying for the domain name registration with Bitcoin, utilizing virtual private network ("VPN") services that provided a level of anonymity for persons when accessing the internet, and utilizing services that provided a level of anonymity for a person registering a domain name.

32.     Defendant REECE A. LINE, and other co-schemers known to the United States Attorney, established email addresses using the false domain names that were designed to hide their true identities and mislead companies into believing that the email addresses were associated with persons who worked for a legitimate company.

33.     Defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers known to the United States Attorney established new phone numbers that were not directly tied to them by, among other things, purchasing prepaid cellular phones in false names.

34.     Defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers known to the United States Attorney purchased prepaid Amazon gift cards and prepaid debit cards.

35.     Defendant REECE A. LINE, and other co-schemers known to the United States Attorney, rented mailboxes at UPS Stores to which they could have merchandise shipped.

36.     Defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers known to the United States Attorney located vacant homes to which they could have merchandise shipped.

37.     Defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers known to the United States Attorney, used the false email addresses, the new phone numbers, the prepaid Amazon gift cards and debit cards, the vacant home addresses, and the

mailbox at the UPS store to establish false Amazon customer accounts in false names and false addresses.

### Amazon Account Fraud

38.    Defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers known to the United States Attorney, purchased and otherwise obtained merchandise from Amazon and other companies using the false Amazon accounts they had created and paid for the merchandise using the prepaid Amazon gift cards and prepaid debit cards.

39.    Defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers known to the United States Attorney, falsely claimed, by placing telephone calls to, sending emails to, and initiating online chats with Amazon and other companies from which they had previously ordered and obtained merchandise, that the merchandise they ordered had never arrived or had arrived damaged, when in fact it had arrived in an undamaged condition.

40.    Defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers known to the United States Attorney, through these false representations, caused Amazon and other companies to ship via USPS or in interstate commerce via commercial interstate carriers, including FedEx, and UPS, multiples of the same item for no additional charge.

### Warranty Fraud

41.    Defendant REECE A. LINE, and other co-schemers known to the United States Attorney, obtained and ascertained serial numbers for NeatConnect Cloud Scanners, Roomba 980 Robotic Vacuums, APC Smart-UPS products, Cisco computer hardware, and other items that they did not own or possess.

42.     Defendant REECE A. LINE, and other co-schemers known to the United States Attorney, created false receipts showing that they had purchased NeatConnect Cloud Scanners, Roomba 980 Robotic Vacuums, and other items that they had never purchased and did not own.

43.     Defendant REECE A. LINE, and other co-schemers known to the United States Attorney, contacted Neat, iRobot, APC, Cisco, and other companies and initiated false warranty claims via telephone calls, emails, and online chats by providing legitimate serial numbers for items manufactured by those companies that they did not own or possess, as well as false receipts, false names, false email addresses, false shipping addresses, and other false information, and by falsely claiming that they were the owners of the items in question and that the items were not working properly.

44.     Defendant REECE A. LINE, and other co-schemers known to the United States Attorney, provided the customer service representatives for Neat, iRobot, APC, Cisco, and other companies with descriptions of the supposed problems with the items that defendant LINE and his co-schemers claimed were broken that defendant LINE and his co-schemers knew would prevent the customer service representatives from solving the problems through troubleshooting and would necessarily require the replacement of the supposedly faulty items.

45.     Defendant REECE A. LINE, and other co-schemers known to the United States Attorney, provided Neat, iRobot, APC, Cisco, and other companies addresses at which the fraudulently-obtained replacement merchandise could be shipped, including addresses in Houston, Texas, Manvel, Texas, Northfield, Minnesota, and Baton Rouge, Louisiana, and caused Cisco to ship via FedEx the computer hardware from a warehouse in Roanoke, Texas, to the addresses provided by defendant LINE and his co-schemers.

46.     Through these false submission of warranty claims and these various false statements, defendant REECE A. LINE, and other co-schemers known to the United States Attorney, caused Neat, iRobot, APC, Cisco, and other companies to ship via USPS or in interstate commerce via commercial interstate carriers, including FedEx and UPS, to the false addresses they had provided, hundreds of warranty replacement items to which they had no legitimate right.

47.     Defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers known to the United States Attorney, traveled to the false addresses and the mail box stores they had used as the shipping addresses for the merchandise they obtained by fraud, including merchandise shipped from Amazon, Neat, iRobot, and Cisco, in order to pick up the fraudulently-obtained merchandise.

48.     Defendant REECE A. LINE, and other co-schemers known to the United States Attorney, promised the companies with whom they had initiated false warranty claims that they would send back the supposedly broken products, when in fact they never owned the products in question and never shipped back any broken products.

49.     Defendant REECE A. LINE, and other co-schemers known to the United States Attorney submitted approximately 101 false Cisco Warranty and Cisco SMARTnet service requests for Cisco products that defendant LINE and his co-schemers did not own or possess, which led to the creation of approximately 101 SR numbers, all in an attempt to obtain by fraud computer hardware from Cisco with a retail value of approximately $2,908,833.

50.     Defendant REECE A. LINE, and other co-schemers known to the United States Attorney, by their misrepresentations made during and in furtherance of the scheme,

successfully induced Cisco to ship approximately 81 pieces of valuable Cisco computer hardware to them via FedEx, with a retail value of approximately $1,911,733.

51.     Defendant REECE A. LINE, and other co-schemers known to the United States Attorney, sold the Cisco computer hardware they obtained during and in furtherance of this scheme to companies that were in the business of purchasing and reselling computer hardware.

52.     Defendant REECE A. LINE used a false name when he sold the Cisco computer hardware to companies that were in the business of purchasing and reselling computer hardware, and falsely represented that he had obtained the computer hardware in a legitimate manner.

53.     Defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers known to the United States Attorney, established and obtained eBay accounts, PayPal accounts, and Amazon seller accounts over which they had access and control.

54.     Defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers known to the United States Attorney, sold the items that they had fraudulently obtained from Amazon, Neat, iRobot, and other companies by, among other things, listing those items for sale on eBay or through Amazon seller accounts over which they had access and control.

55.     Between on or about December 22, 2014, and on or about March 6, 2017, defendant REECE A. LINE and other co-schemers known to the United States Attorney sold approximately 63 fraudulently-obtained NeatConnect Cloud Scanners, for a total of approximately $24,207.

56.     Between on or about November 9, 2015, and on or about February 24, 2016, defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers known

to the United States Attorney, sold fraudulently-obtained merchandise totaling approximately $19,864.85 through Amazon accounts over which they had access and control.

57.     Between on or about November 16, 2015, and on or about April 14, 2016, defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers known to the United States Attorney, sold fraudulently-obtained merchandise totaling approximately $76,060.05 through eBay accounts over which they had access and control.

58.     Defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers known to the United States Attorney shipped via USPS or in interstate commerce via commercial interstate carriers the fraudulently-obtained items that they then sold through eBay and Amazon.

59.     Defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers known to the United States Attorney, transferred the proceeds of their sale of the fraudulent-obtained items from the Amazon seller accounts they used to bank accounts over which they had access and control.

60.     Defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers known to the United States Attorney, transferred the proceeds of their eBay sales of the fraudulently-obtained items from the PayPal accounts over which they had access and control to bank accounts over which they had access and control.

61.     Defendant REECE A. LINE, co-schemer Gerald Alan Goss, and other co-schemers know to the United States Attorney, shared the fraud proceeds they obtained as a result of their scheme to defraud.

## MAIL FRAUD

62.     On or about each of the following dates, in the Eastern District of

Pennsylvania, the Middle District of Pennsylvania, the Western District of Pennsylvania, the

Northern District of Texas, the Southern District of Texas, the District of Minnesota, the Middle

District of Louisiana, and elsewhere, defendant

### REECE A. LINE

alone and with one or more co-schemers known to the United States Attorney, for the purpose of

executing the scheme described above, and attempting to do so, and aiding and abetting its

execution, knowingly caused to be delivered by mail and commercial interstate carriers,

according to the directions thereon, the following items:

| COUNT | DATE | FROM | TO | DESCRIPTION OF ITEM |
|---|---|---|---|---|
| ONE | November 24, 2014 | Philadelphia, Pennsylvania | Houston, Texas | NeatConnect Cloud Scanner, retail value approximately $499. |
| TWO | January 17, 2016 | Pearland, Texas | Dallas, Pennsylvania | EVGA GeForce GTX 980 Superclocked ACX 2.0 Gaming Graphics Card, sold via eBay and shipped to A.L. via FedEx |
| THREE | February 4, 2016 | Pearland, Texas | Parkesburg, Pennsylvania | Intel Boxed Core 17-6700K 4.00 GHz 8M Computer Processor, sold via defendant LINE's eBay account for approximately $368 plus shipping, and shipped to B.K. via FedEx |
| FOUR | February 25, 2016 | Pearland, Texas | Downingtown, Pennsylvania | Synology Disk Station 4-Bay Network Attached Storage, sold via defendant LINE's eBay account for approximately $342.30 plus shipping, and shipped to V.E. via FedEx |

| COUNT | DATE | FROM | TO | DESCRIPTION OF ITEM |
|---|---|---|---|---|
| FIVE | March 5, 2016 | Pearland, Texas | Dalton, Pennsylvania | EVGA NVIDIA GeForce GTX 890 Ti Hybrid 6GB Graphics Card, sold via defendant LINE's eBay account for approximately $691.69 plus shipping, and shipped to G.K. via FedEx |
| SIX | April 4, 2016 | Lancaster, Pennsylvania | Pearland, Texas | Roomba 980 Robotic Vacuum, shipped via UPS, tracking number 1ZE79A960369311251 |
| SEVEN | April 8, 2016 | Roanoke, Texas | Houston, Texas | Cisco Model # A9K-24X10GE-SE, retail value approximately $400,000, shipped via FedEx, tracking # 671037901306, in response to Cisco SR # 680296717 |
| EIGHT | April 10, 2016 | Pearland, Texas | Allegheny, Pennsylvania | USA Model Nikon D7100 24.1 MP DX-Format CMOS Digital SLR Camera, sold via defendant LINE's eBay account for approximately $555.79, and shipped to J.G. via FedEx |
| NINE | April 13, 2016 | Roanoke, Texas | Houston, Texas | Cisco Model # A9K-24X10GE-SE, retail value approximately $240,000, shipped via FedEx, tracking # 671037935510, in response to Cisco SR # 680296717 |
| TEN | April 14, 2016 | Middletown, Pennsylvania | Pearland, Texas | APC Model # SMT-3000RM2U, retail value approximately $1,849.99, shipped via FedEx freight, tracking # 77390819 |
| ELEVEN | July 6, 2016 | Roanoke, Texas | Northfield, Minnesota | Cisco Model # WS-C3850-24T-S, retail value approximately $6,500, shipped via FedEx, tracking # 679945706784, in response to Cisco SR # 639183823 |

| COUNT | DATE | FROM | TO | DESCRIPTION OF ITEM |
|---|---|---|---|---|
| TWELVE | July 6, 2016 | Roanoke, Texas | Northfield, Minnesota | Cisco Model # WS-C3850-48T-E, retail value approximately $11,700, shipped via FedEx, tracking # 679945709728, in response to Cisco SR # 638183907 |
| THIRTEEN | July 29, 2016 | Roanoke, Texas | Baton Rouge, Louisiana | Cisco Model # WS-C3850-48T-S, retail value approximately $6,900, shipped via FedEx, tracking # 690845049518, in response to Cisco SR # 680693195 |
| FOURTEEN | August 11, 2016 | Roanoke, Texas | Manvel, Texas | Cisco Model # WS-C3850-48T-E, retail value approximately $11,700, shipped via FedEx, tracking # 701630768158, in response to Cisco SR # 680763785 |
| FIFTEEN | August 15, 2016 | Roanoke, Texas | Manvel, Texas | Cisco Model # WS-C3850-48T-E, retail value approximately $11,700, shipped via FedEx, tracking # 701630791980, in response to Cisco SR # 680763785 |
| SIXTEEN | October 11, 2016 | Roanoke, Texas | Dallas, Texas | Cisco Model # WS-C3850-48T-S, retail value approximately $6,900, shipped via FedEx, tracking # 707691514082, in response to Cisco SR # 681095922 |
| SEVENTEEN | October 11, 2016 | Roanoke, Texas | Dallas, Texas | Cisco Model # WS-C3850-48T-S, retail value approximately $6,900, shipped via FedEx, tracking # 707691514222, in response to Cisco SR # 681095922 |
| EIGHTEEN | November 30, 2016 | Roanoke, Texas | Houston, Texas | Two Cisco Model # WS-C3850-48T-S, total retail value approximately $13,800, shipped via FedEx, tracking # 714903347820, in response to Cisco SR # 681378057 |

| COUNT | DATE | FROM | TO | DESCRIPTION OF ITEM |
|---|---|---|---|---|
| NINETEEN | December 5, 2016 | Roanoke, Texas | Houston, Texas | Two Cisco Model # WS-C3850-48T-S, total retail value approximately $13,800, shipped via FedEx, tracking # 714903384868, in response to Cisco SR # 681378057 |
| TWENTY | February 15, 2017 | Roanoke, Texas | Clute, Texas | Cisco Model # WS-C3850-48P-L, retail value approximately $10,400, shipped via FedEx, tracking # 721766144024, in response to Cisco SR # 68179259 |
| TWENTY-ONE | February 15, 2017 | Roanoke, Texas | Clute, Texas | Cisco Model # WS-C3850-48F-S, retail value approximately $8,400, shipped via FedEx, tracking # 721766144035, in response to Cisco SR # 68179259 |
| TWENTY-TWO | June 16, 2017 | Middletown, Pennsylvania | Pearland, Texas | APC Model # SMT-1500, retail value approximately $699.99, shipped via FedEx. |

All in violation of Title 18, United States Code, Sections 1341, 3559(g), and 2.

## COUNTS TWENTY-THREE THROUGH THIRTY

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

      1.     Paragraphs One through 28 of Count One are incorporated here.

### THE SCHEME

      2.     Beginning in or about November 2014, and continuing until in or about June 2017, within the Eastern District of Pennsylvania, the Southern District of Texas, and elsewhere, defendant

### REECE A. LINE

together and with co-schemers known and unknown to the United States Attorney, devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

### MANNER AND MEANS

      3.     Paragraphs 30 through 61 of Count One are incorporated here.

### WIRE FRAUD

      4.     On or about each of the following dates, in the Eastern District of Pennsylvania, the Middle District of Tennessee, the Southern District of Texas, and elsewhere, defendant

### REECE A. LINE

alone and with co-schemers known and unknown to the United States Attorney, for the purpose of executing the scheme described above, and attempting to do so, and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below, each transmission constituting a separate count:

| COUNT | DATE | ORIGIN OF WIRE | DESTINATION OF WIRE | METHOD OF WIRE AND DESCRIPTION |
|-------|------|----------------|---------------------|--------------------------------|
| TWENTY-THREE | December 18, 2015 | Philadelphia, Pennsylvania | La Vergne, Tennessee | E-mail from Neat headquarters to Neat warehouse directing shipment of NeatConnect Cloud Scanner to Galveston, Texas in response to false warranty claim #SO3839620 |
| TWENTY-FOUR | December 18, 2015 | Philadelphia, Pennsylvania | La Vergne, Tennessee | E-mail from Neat headquarters to Neat warehouse directing shipment of NeatConnect Cloud Scanner to Houston, Texas in response to false warranty claim #SO3839677 |
| TWENTY-FIVE | February 16, 2016 | Philadelphia, Pennsylvania | La Vergne, Tennessee | E-mail from Neat headquarters to Neat warehouse directing shipment of NeatConnect Cloud Scanner to Pearland, Texas in response to false warranty claim #SO3989245 |
| TWENTY-SIX | April 4, 2016 | Philadelphia, Pennsylvania | La Vergne, Tennessee | E-mail from Neat headquarters to Neat warehouse directing shipment of NeatConnect Cloud Scanner to Pearland, Texas in response to false warranty claim #SO4098117 |

| COUNT | DATE | ORIGIN OF WIRE | DESTINATION OF WIRE | METHOD OF WIRE AND DESCRIPTION |
|---|---|---|---|---|
| TWENTY-SEVEN | April 7, 2016 | Philadelphia, Pennsylvania | La Vergne, Tennessee | E-mail from Neat headquarters to Neat warehouse directing shipment of NeatConnect Cloud Scanner to Pearland, Texas in response to false warranty claim #SO4108081 |
| TWENTY-EIGHT | April 7, 2016 | Philadelphia, Pennsylvania | La Vergne, Tennessee | E-mail from Neat headquarters to Neat warehouse directing shipment of NeatConnect Cloud Scanner to Houston, Texas in response to false warranty claim #SO4108114 |
| TWENTY-NINE | April 25, 2016 | Philadelphia, Pennsylvania | La Vergne, Tennessee | E-mail from Neat headquarters to Neat warehouse directing shipment of NeatConnect Cloud Scanner to Houston, Texas in response to false warranty claim #SO4156627 |
| THIRTY | December 21, 2016 | Philadelphia, Pennsylvania | La Vergne, Tennessee | E-mail from Neat headquarters to Neat warehouse directing shipment of NeatConnect Cloud Scanner to Houston, Texas in response to false warranty claim #SO4671717 |

All in violation of Title 18, United States Code, Sections 1343, 3559(g), and 2.

## COUNT THIRTY-ONE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

At all times material to this information:

1. The Internal Revenue Service ("IRS") was an agency of the United States Department of the Treasury responsible for administering and enforcing the tax laws of the United States. Under these laws, individuals were required to report income to the IRS on federal income tax return forms.

2. Paragraphs 30 through 61 of Count One are incorporated here.

3. During calendar year 2014, defendant REECE A. LINE had no legitimate job.

4. During calendar year 2014, defendant REECE A. LINE earned substantial income from various fraud schemes in furtherance of which defendant LINE defrauded various companies, including companies located within the Eastern District of Pennsylvania, into providing him with merchandise to which he was not lawfully entitled, and then selling that merchandise, including to persons residing in the Eastern District of Pennsylvania and then shipping that merchandise, including to persons residing in the Eastern District of Pennsylvania.

5. During calendar year 2014, defendant REECE A. LINE received gross income of at least approximately $43,754.70. Defendant LINE's gross income for 2014 exceeded the threshold required for filing an individual income tax return with the IRS.

6. On this gross income, defendant REECE A. LINE owed to the United States of America federal income tax of at least approximately $10,307.

7. From in or about January 1, 2014, through in or about April 2015, in the Eastern District of Pennsylvania, the Southern District of Texas, and elsewhere, defendant

## REECE A. LINE

a resident of Pearland, Texas, willfully attempted to evade and defeat an income tax due and owing by him to the United States of America for the calendar year 2014 by failing to make an income tax return on or about April 15, 2015, as required by law, to any proper officer of the Internal Revenue Service, and by failing to pay to the Internal Revenue Service this income tax, and by concealing and attempting to conceal from all proper officers of the United States of America his true and correct income through various means, including, among other thing:

      a.      by failing to file a federal income tax return with the IRS for calendar year 2014 and failing to report the income he received during 2014;

      b.      by storing proceeds of his fraud in bank accounts and PayPal accounts held in the names of co-schemers;

      c.      by storing at his residence large amounts of cash obtained through fraud;

      d.      by converting fraud proceeds to cash;

      e.      by using cash to pay his personal living expenses;

      f.      by using false email addresses, false domain names, prepaid gift cards, and false identities to conceal his involvement in the schemes to defraud.

All in violation of Title 26, United States Code, Section 7201.

## COUNT THIRTY-TWO

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

At all times material to this information:

1.      The Internal Revenue Service ("IRS") was an agency of the United States Department of the Treasury responsible for administering and enforcing the tax laws of the United States. Under these laws, individuals were required to report income to the IRS on federal income tax return forms.

2.      Paragraphs 30 through 61 of Count One are incorporated here.

3.      During calendar year 2015, defendant REECE A. LINE had no legitimate job.

4.      During calendar year 2015, defendant REECE A. LINE earned substantial income from various fraud schemes in furtherance of which defendant LINE defrauded various companies, including companies located within the Eastern District of Pennsylvania, into providing him with merchandise to which he was not lawfully entitled, and then selling that merchandise, including to persons residing in the Eastern District of Pennsylvania and then shipping that merchandise, including to persons residing in the Eastern District of Pennsylvania.

5.      During calendar year 2015, defendant REECE A. LINE received gross income of at least approximately $61,372.45. Defendant LINE's gross income for 2015 exceeded the threshold required for filing an individual income tax return with the IRS.

6.      On this gross income, defendant REECE A. LINE owed to the United States of America federal income tax of at least approximately $16,147.

7.      From in or about January 1, 2015, through in or about April 2016, in the Eastern District of Pennsylvania, the Southern District of Texas, and elsewhere, defendant

## REECE A. LINE

a resident of Pearland, Texas, willfully attempted to evade and defeat an income tax due and owing by him to the United States of America for the calendar year 2015 by failing to make an income tax return on or about April 15, 2016, as required by law, to any proper officer of the Internal Revenue Service, and by failing to pay to the Internal Revenue Service this income tax, and by concealing and attempting to conceal from all proper officers of the United States of America his true and correct income through various means, including, among other thing:

      a.      by failing to file a federal income tax return with the IRS for calendar year 2015 and failing to report the income he received during 2015;

      b.      by storing proceeds of his fraud in bank accounts and PayPal accounts held in the names of co-schemers;

      c.      by storing at his residence large amounts of cash obtained through fraud;

      d.      by converting fraud proceeds to cash;

      e.      by using cash to pay his personal living expenses;

      f.      by using false email addresses, false domain names, prepaid gift cards, and false identities to conceal his involvement in the schemes to defraud.

All in violation of Title 26, United States Code, Section 7201.

## COUNT THIRTY-THREE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

At all times material to this information:

1.      The Internal Revenue Service ("IRS") was an agency of the United States Department of the Treasury responsible for administering and enforcing the tax laws of the United States. Under these laws, individuals were required to report income to the IRS on federal income tax return forms.

2.      Paragraphs 30 through 61 of Count One are incorporated here.

3.      During calendar year 2016, defendant REECE A. LINE had no legitimate job.

4.      During calendar year 2016, defendant REECE A. LINE earned substantial income from various fraud schemes in furtherance of which defendant LINE defrauded various companies, including companies located within the Eastern District of Pennsylvania, into providing him with merchandise to which he was not lawfully entitled, and then selling that merchandise, including to persons residing in the Eastern District of Pennsylvania and then shipping that merchandise, including to persons residing in the Eastern District of Pennsylvania.

5.      During calendar year 2016, defendant REECE A. LINE received gross income of at least approximately $49,137.54. Defendant LINE's gross income for 2016 exceeded the threshold required for filing an individual income tax return with the IRS.

6.      On this gross income, defendant REECE A. LINE owed to the United States of America federal income tax of at least approximately $11,778.

7.      From in or about January 1, 2016, through in or about April 2017, in the Eastern District of Pennsylvania, the Southern District of Texas, and elsewhere, defendant

27

## REECE A. LINE

a resident of Pearland, Texas, willfully attempted to evade and defeat an income tax due and

owing by him to the United States of America for the calendar year 2016 by failing to make an

income tax return on or about April 15, 2017, as required by law, to any proper officer of the

Internal Revenue Service, and by failing to pay to the Internal Revenue Service this income tax,

and by concealing and attempting to conceal from all proper officers of the United States of

America his true and correct income through various means, including, among other thing:

        a.      by failing to file a federal income tax return with the IRS for

calendar year 2016 and failing to report the income he received during 2016;

        b.      by storing proceeds of his fraud in bank accounts and PayPal

accounts held in the names of co-schemers;

        c.      by storing at his residence large amounts of cash obtained through

fraud;

        d.      by converting fraud proceeds to cash;

        e.      by using cash to pay his personal living expenses;

        f.      by using false email addresses, false domain names, prepaid gift

cards, and false identities to conceal his involvement in the schemes to defraud.

      All in violation of Title 26, United States Code, Section 7201.

## NOTICE OF FORFEITURE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

      1.    As a result of the violations of Title 18, United States Code, Sections 1341 and 1343 set forth in this information, defendant

### REECE A. LINE

shall forfeit to the United States of America any property constituting, or derived from, proceeds obtained directly or indirectly from the commission of such offense, including but not limited to $178,851 in United States currency (money judgment).

      2.    If any of the property described above, as a result of any actor omission of the defendant:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred to, sold to, or deposited with a third party;

      c.    has been placed beyond the jurisdiction of this Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c) incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

      All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and 28 U.S.C. Section 2461.

                      **WILLIAM M. McSWAIN**
                      **UNITED STATES ATTORNEY**